| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY | |
| FORMAN HOLT & ELIADES LLC<br>218 Route 17 North<br>Rochelle Park, New Jersey 07662<br>(201) 845-1000<br>Attorneys for Debtors<br>Joseph M. Cerra (JMC-0903) | |
| In re:<br><br>WILLIAM AND DEBORAH HECKSTEDEN,<br><br>                Debtors. | Chapter 11<br><br>Case No.: 05-36175 (RTL) |
| WILLIAM and DEBORAH HECKSTEDEN,<br><br>                Plaintiffs,<br><br>vs.<br><br>ALL MODES TRANSPORT, INC. d/b/a<br>AMS LOGISTICS,<br><br>                Defendant. | Adv. Pro. No. 05-2615 (RTL)<br><br>Return Date: 2/6/2006 at 10 a.m.<br>Oral Argument:  Requested |

**PLAINTIFFS' STATEMENT OF MATERIAL UNDISPUTED FACT
PURSUANT TO LOCAL DISTRICT COURT RULE 56.1,
MADE APPLICABLE HEREIN BY WAY OF LBR 1001-1,
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs William Hecksteden ("Mr. Hecksteden") and Deborah Hecksteden ("Mrs. Hecksteden"), by and through their attorneys Forman Holt & Eliades LLC, hereby provide the following statement of material undisputed fact, pursuant to Local District Rule 56.1, made applicable herein by Local Bankruptcy Rule 1001-1, in support of their motion for summary judgment:

## BACKGROUND

1. All Modes filed a complaint against William G. Hecksteden, Deborah A. Hecksteden, and Vendor Management Integrity on January 28, 2002. All Modes alleged that Mr. Hecksteden breached the terms of his employment agreement which stated that he was to "provide services only to [All Modes], as [All Modes] may direct." (Complaint, ¶4) (Ex. "A" to Cerra Cert.).

2. All Modes claimed against Mr. Hecksteden for breach of contract, breach of fiduciary duty, and fraud. All Modes also sued Ms. Hecksteden, claiming that she tortiously interfered with Mr. Hecksteden's performance of his employment contract, and that she conspired with him to operate a "competing" business under the name "Vendor Management Integrity." Id.

3. The Defendants filed their Answer and Counterclaim on June 17, 2002. The Defendants denied all material allegations and counterclaimed to recover compensation owed under Mr. Hecksteden's employment contract, which had not been paid to him. (Ex. "B" to Cerra Cert.).

4. The matter proceeded to trial on March 15, 2005. The matter was heard on the following trial dates: March 15, 2005; March 16, 2005; March 17, 2005; March 21, 2005; March 22, 2005; March 23, 2005, and March 24, 2005. (Ex. "C" to Cerra Cert.).

5. On March 24, 2005, a purported settlement was placed on the record. (Ex. "C" to Cerra Cert.). Shortly thereafter, on April 12, 2005, the Defendants moved to

vacate the settlement as it resulted from coercion and improper influence, and was the product of duress. (Ex. "D" to Cerra Cert.).

6. The Superior Court of New Jersey held hearings on the issue of whether its threat was valid on June 7, 2005, July 1, 2005, and August 8, 2005. After the June 7, 2005 hearing, the court entered a judgment against the Heckstedens for $600,000 but specified that it was not subject to execution pending further order of the court.

7. On August 8, 2005, the court entered orders denying the Debtors' motion to vacate the settlement and for a new trial, and amending the June 7, 2005 order to authorize execution on the judgment.

### A. The Plaintiff's Lack of a Case on the Merits

8. Over the course of several days of its case-in-chief, the Plaintiff called four witnesses: Paul Kilgannon; Zadick Askinzi; David Argen; and Carl Sambus.

9. Not one of those witnesses provided any competent testimony that Mr. Hecksteden operated a competing business.

10. Instead of meaningful evidence the Plaintiff offered unsubstantiated conjecture best characterized, unwittingly, by Mr. Askinazi. While commenting on the event which was the purported proof that Mr. Hecksteden operated a competing business, Mr. Askinazi testified, "I had no proof of anything." (3T60:18-60:22).

11. The purported settlement was not driven by a compelling case on the merits, or even a plausible case on the merits. During discovery, the Plaintiff obtained raw work data sheets that Mr. Hecksteden had prepared and had forwarded to his accountant for use in the preparation of his tax returns.

3

12. The Plaintiff's counsel noticed that this raw data included some business expenses that Mr. Hecksteden had paid through the use of a personal credit card. Some of these expenses had been reimbursed by All Modes.

13. At the settlement conference convened by the court on March 15, 2005, the Plaintiff's counsel advised the trial court that his cross-examination of Mr. Hecksteden would elicit evidence of tax improprieties.

14. The import of the Plaintiff's tactic was clear. A trial court has an obligation to report criminal conduct of which it learns through proceedings before it. No matter how carefully the Plaintiff was trying to couch its tactic, it was participating in a threat to advance a criminal charge in order to coerce a civil settlement.

15. During the cross-examination of Mr. Hecksteden, the court called both counsel into chambers and issued a warning to the Defendants' counsel that the court would refer to Mr. Hecksteden for prosecution pursuant to the <u>Sheridan</u> decision if he continued to testify.

16. The court stated that Mr. Hecksteden could either settle the case or invoke his Fifth Amendment privilege against self-incrimination, but said that if he continued to testify in his defense, the court would issue a letter to a prosecutorial agency pursuant to the <u>Sheridan</u> decision.

17. The court stated that the testimony to that point did not establish a material criminal violation so that a timely settlement would vitiate its obligations under <u>Sheridan</u>.

18. Armed with the threat of a criminal prosecution the moment Mr. Hecksteden continued to testify, the Plaintiff utilized the pending threat to coerce a $600,000 settlement.

4

### B. Trial Court's Assessment of the Lack of Merit of Plaintiff's Case

19. The court, for its part, was surprised by the settlement amount, stating on the record that the Plaintiff's case had been lacking and that the tax issue was "outside" the issues that had been before the court. At subsequent hearings in this case, the court made it abundantly clear that All Modes' case was weak. At a hearing on June 7, 2005, the court stated: "I must tell the both of you that it seemed to me that [All Modes] really at this went outside with Mr. Hecksteden to talk about that (the tax issue). [All Modes] really didn't have very much to stand on, that were [it was] alleging with regard to a competing business was really not a competing business." (11T7:19-7:22).

20. The court observed further that the tactics employed by All Modes "extracted a settlement that they never would have been able to get by means of a jury verdict." (11T12:18-12:20).

21. The court stated, "It had to be obvious to you as it was to Mr. Cohen that I didn't think $600,000 was the appropriate number. I told that to Mr. Cohen, specifically, I recall." (11T14:17-14:20).

22. The court noted, "$600,000 is a lot of money" and represented a "fairly outrageous settlement" which was "totally unwarranted." (11T28:4-28:10).

23. It further noted that the "evidence that was shown didn't come anywhere near warranting the settlement amount." (11T31:18-31:19).

24. The court also made it clear that "your clients were using the tax situation to extract a settlement that – no relationship to any cause of action that I could see in this case." (11T31:19-31:23).

5

25. The court stated, "if we had a jury verdict for $800,000 or $600,000 it would have been the subject to a remittur action within three seconds." (11T33:3-33:6). "But [All Modes], and I – I made this known to both counsel, [All Modes] really had [the Heckstedens] over a barrel."

### C. The Trial Call and Pre-Trial Proceedings

26. The matter was called for trial on March 14, 2005 and was assigned the following day to the court. The court conducted a conference at which settlement was addressed.

27. At that time, rather than tout the strength of his case on the merits, the Plaintiff's counsel, by his own admission, indicated that he intended to question Mr. Hecksteden on whether he had "claimed tax deductions in connection with his business activities under the name 'Vendor Management Integrity' for expenses identical in nature to expenses he had claimed in connection with his employment with the plaintiff, and for which he had been reimbursed by plaintiff." See Certification of All Modes' Counsel in Opposition to Motion to Vacate, ¶8) (Cerra Cert., Ex. "E").

28. The Plaintiff's counsel and the Defendants' counsel retired to a room to discuss settlement at the court's direction and – in the words of the Plaintiff's counsel – "in light of what we had just discussed." Id.

29. As the Plaintiff's counsel acknowledged, he then "gave [Defendants' counsel] copies of records that I intended to introduce at trial which indicated that defendant William Hecksteden had been reimbursed for a business expense in connection

6

with his employment with plaintiff, and also subsequently as expenses [sic] in his amended Federal income tax return." (Id., ¶9).

30. When the Defendants refused to capitulate to the Plaintiff's settlement demand, the Plaintiff's counsel, according to his own words, told Defendants' counsel that he "thought his client was taking an enormous risk" not because he had a strong case on the merits but because he "possessed 'tons' of evidence to demonstrate William Hecksteden's double-charging of expenses during 1998 through 2001, while he was employed by plaintiff." (Id., ¶10).

### D. The Plaintiff's Failed Case on the Merits

31. The Plaintiff called four witnesses in support of its case against Mr. Hecksteden but, as a sober review of the record will reveal, not one of these witnesses provided any evidence on which a rational fact-finder could have relied to determine that the Defendants had engaged in any of the conduct alleged in the Plaintiff's Complaint.

32. The Plaintiff did not produce a single piece of evidence tending to establish the business in which VMI was engaged, or that its business competed with All Modes. The Plaintiff did not even offer proof that Mr. Hecksteden managed, controlled, or otherwise operated VMI.

33. The Plaintiff's failed case on the merits is also evident from a review of the record. Patrick Kilgannon took the stand on March 16, 2005 and testified that he worked for All Modes from August 1989 through April 2003 as the general manager of its New Jersey facilities and later in a sales role. (2T59:14-60:6).

7

34. Mr. Kilgannon testified to nothing more that "sometime" in the middle of 2000, one of his employees, David Argen, noticed an envelope on a desk that was addressed to one of All Modes' customers and had a return address "from a company, V something," from the town in which Mr. Hecksteden resided.

35. Mr. Kilgannon testified that Mr. Argen told him about the envelope. (2T61:10-61:25).

36. Mr. Kilgannon called All Modes' Los Angeles location and then went down to discuss with Mr. Argen the conversation he had with All Modes' Los Angeles' location. (2T63:1-64:24).

37. While this conversation was on-going, Mr. Hecksteden allegedly came into the room and an argument ensued. Mr. Kilgannon said that he did not recall the specifics of what transpired, noting that "[i]t's been five years." (2T65:1-65:17).

38. Eventually Zadick Askinazi, one of all All Modes' principals claimed to have entered the room. (2T67:22-68:6).

39. Mr. Askinazi took the stand on March 16, 2005. Mr. Askinazi acknowledged that All Modes was in the "pick and pack fulfillment" business which entails "taking goods in – in – in bulk and the picking and packing, fulfilling orders, and then putting them into separate boxes." (2T103:15-103:19).

40. All Modes purchased the boxes used in this process from corrugated manufacturers. (2T103:21-103:25). Mr. Askinazi described the "pick and pack" function as one it which All Modes takes goods which are not ready to be shipped because they

8

are packed in something other than a shippable carton – the "pick" part – and to place them in a shippable box – the "pack" part. (3T21:9-21:24).

41. Further Mr. Askinazi testified that Mr. Hecksteden had "done a wonderful job" … "in creating new sales opportunities" as well as "moving the company forward." (3T51:1-51:3).

42. He stated: "We were a growing entity and actually I felt very comfortable with his efforts and the fact that he was doing a good job developing sales, as well as his efforts to maintain those sales." (3T51:3-51:07).

43. As a result of his exemplary performance, in December 1999, All Modes promoted Mr. Hecksteden to the title of "Chief Operating Officer" of the company (3T52:15-53:1).

44. Mr. Hecksteden, however, did not assume any responsibility as a true officer of the company and remained an employee with the responsibility of providing leadership for all the day-to-day operations of the company. (3T54:1-54:20).

45. Mr. Hecksteden's remarkable job performance was confirmed at trial by Mr. Argen, All Modes' director of account services, who testified that All Modes' sales jumped under Mr. Hecksteden's leadership from about $7 million or $8 million to $20 to $25 million. (3T133:8-133:19).

46. This exponential growth in business was confirmed by Mr. Askinazi. He acknowledged that under Mr. Hecksteden's leadership, All Modes grew from an $8 million company in June 1997 to a $20 million company by the end of 1999. (5T87:20-88:8).

47. Mr. Askinazi also testified as to the alleged event recalled by Mr. Kilgannon. He stated that on a day in June 2000, he was walking past Mr. Argen's office when he heard a loud argument. (3T56:1-56:20).

48. He claimed to have entered the room and observed "three of my top level managers having a heated discussion, Dave Argen, Pat Kilgannon, and Bill Hecksteden." (3T56:15-56:20).

49. He stated that Mr. Hecksteden and Mr. Kilgannon were involved and Mr. Argen was sitting back and listening to the argument. (3T57:1-57:7).

50. Supposedly he heard Mr. Hecksteden deny that he knew anything about VMI. (3T59:16-59:20).

51. Mr. Argen also testified about this incident and also said that Mr. Hecksteden denied that he was involved with VMI, (3T125:6-125:12) although he admitted that it was not a very long discussion at all about VMI (3T150:24-151:1).

52. At trial, All Modes touted this incident as "evidence" that Mr. Hecksteden had operated a competing business. However, Mr. Askinazi unwittingly summed up the true probative value of this information when, assessing this event, he stated, "I had no proof of anything." (3T60:18-60:22).

53. The Plaintiff finally called Carl Sambus, All Modes' Vice President for Operations, to authenticate invoices for the purchase of corrugated boxes – in order to demonstrate that All Modes purchased corrugated boxes which it then sold to customers at a mark-up.

10

54. All Modes then rested its case. It rested without producing *any* evidence of what VMI did, or whether it competed with All Modes, or whether Mr. Hecksteden, rather than his wife, actually operated the business.

55. Mr. Hecksteden resigned from the company on September 17, 2001 but stayed on as agreed in order to transition his authority back to the company. (3T87:8-88:20).

56. After Mr. Hecksteden left All Modes in November 2001, Mr. Askinazi called VMI about a corrugated box order for a customer and heard Mrs. Hecksteden's voice on an answering machine message. (3T93:20-94:16).

57. This fact, with nothing more, precipitated the lawsuit. (3T94:25-94:95:18).

### E. The Defendants' Case

58. The only evidence of the business of VMI and whether it competed with All Modes was introduced during the Defendants' case.

59. The Defendants called Richard Teska, who had formerly managed All Modes' Atlanta facility, and asked him whether he was aware of VMI.

60. Mr. Teska testified that he knew of VMI, that it performed services that All Modes did not, and that it was operated by Deborah Hecksteden -- not William Hecksteden. (8T24:3-25:7).

61. Thus, it was undisputed on this record that VMI was not a competing business (8T24:3-25:3).

11

62. Moreover, Mr. Teska's testimony made it abundantly clear that All Modes' protestations that it was unaware of VMI were not true. (8T26:8-26:24).

63. Mr. Teska testified that VMI served as a broker for "components," which he described as the parts of the retail packaging for videos. (8T22:23-23:19).

64. All Modes was not in the business of supplying the components for retail packaging.

65. During his testimony, Mr. Hecksteden testified that he started VMI with his wife in 1997 "to service the needs and requirements of my book of business." (8T135:11-135:18).

66. Further, Mr. Hecksteden explained how the business of VMI complimented the business of All Modes and allowed for him to service his customers through All Modes. All Modes functioned to box and ship goods that were already packaged in retail packaging. The customers, however, needed to have the goods packaged into retail packaging before All Modes even got its hands on the items. Mr. Hecksteden explained: "[i]f the components that are necessary in going up and making a bill of material or a finished good, are controlled by an outside entity such as a company that's in Chicago, Illinois" … "I cannot, in fact, control the in-bound components that are coming in for the bill of materials to satisfy the bill of materials so that we could, in fact, provide the assembly." (8136:1-136:8).

67. "Simply put," Mr. Hecksteden explained, "if I cannot control the components with the – within a certain build, I can't control the assembly and I can't control the distribution. They're my accounts. It's my book of business. And I started

12

this brokerage business with my wife who, in fact, ran the business in 1997." (8T136:9-136:14).

68. Mr. Hecksteden further testified as to how All Modes misled him at the time he negotiated his contract. All Modes represented that it was a $15 million company with a $5 million credit line and the capacity to invest into its systems in order to accommodate the significant business that Mr. Hecksteden would be bringing with him. Mr. Hecksteden further negotiated for bonuses based on sales targets but these bonuses were never paid despite the fact that Mr. Hecksteden reached his targets. All Modes failed to make the investment into its systems as its business expanded, which caused delays and customer dissatisfaction. A number of customers terminated their relationship with All Modes as a result and All Modes' revenues began to decline.

**F.    The Warning of a Criminal Referral**

69. The trial court, in its October 4, 2005 letter to the Appellate Division, explained what occurred during the cross-examination of Mr. Hecksteden, while he was being questioned on what, at best, was a tangential issue that had nothing to do with whether he operated a competing business:

> At the beginning of the cross-examination of defendant William Hecksteden, the court noticed a stack of papers approximately 12 to 20 inches high on plaintiffs' counsel table. In using the first one or two of those documents on cross-examination of defendant William Hecksteden, the plaintiff's counsel made it apparent that Mr. Hecksteden had received reimbursement for approximately $1,800 worth of expenses from his employer and had deducted those same expenses on the tax return of his "side company" as business expenses. Sensing that the remaining foot of documents related to further and similar transgressions, the court asked counsel to confer in chambers and gave the jury a break.

> In chambers, the court told counsel that it did not consider the testimony already rendered as substantial enough to warrant a <u>Sheridan</u> letter. The court did indicate, however, that counsel should confer and that if the remaining documents and further testimony were to reveal similar, and more material transgressions, counsel should be aware that the court was going to write the <u>Sheridan</u> letter. If defendants' counsel was assured that further testimony would no so reveal, he could proceed on that basis. If however, the former scenario was to be the operative scenario, the court suggested that counsel attempt to settle the matter, indicating to them that there was not a single doubt in the court's mind that a <u>Sheridan</u> letter would follow if material violations of federal or state tax law were testified to by Mr. Hecksteden. Plaintiff's counsel had in his briefcase a copy of the <u>Sheridan</u> case, which he gave to defense counsel.
>
> The court told counsel to discuss the case for ten minutes and advise as to where they were heading.

(Cerra Cert., Ex. "F", p. 2).

70.  Mr. Hecksteden filed a certification detailing what went through his mind at this point. He explained that his attorney relayed the court's message to him and he thus understood that "if I proceeded with the trial she would be obligated to contact federal authorities to investigate me. It was my understanding that any such investigation could have criminal implications." (Certification of William Hecksteden in Support of Motion to Vacate Settlement, ¶10) (Cerra Cert., Ex. "D", p. 22a).

71.  "Needless to say I was stunned and greatly concerned about the prospect that a sitting judge would be contacting federal authorities to conduct a potential criminal investigation." (<u>Id</u>., ¶11).

72.  Mr. Hecksteden explained that he and his counsel "sought to contact a tax attorney during our brief recess and in fact was able to do so." (<u>Id</u>., ¶13).

14

73. The attorney, however, was not factually familiar with the matter, and only offered that "if there were irregularities that there certainly could be civil and criminal implications." (Id., ¶13).

74. Mr. Hecksteden sought further to speak to a criminal attorney but was not able to reach one. (Id., ¶14).

75. He was also not able to reach his accountant who had prepared the tax returns. (Id., ¶16).

76. In an effort to buy more time, Mr. Hecksteden and his attorney left the courthouse only to be summoned back by the court by way of a cell phone call. (Id., ¶15).

77. Mr. Hecksteden explained:

> In short, within a period of less than thirty minutes I was being forced to make a decision to either proceed into the Court room and have a judge report me to the federal authorities or to settle the case. Quite frankly, the plaintiff could have asked for anything to settle the case at that juncture and I would have agreed. I could not reach my accountant or criminal counsel nor could I get a full unqualified opinion from tax counsel.
>
> *   *   *   *   *   *   *   *   *   *
>
> The "settlement" that I agreed to was under extreme duress and is huge impact on my family's financial position. I respectfully submit that it would be a miscarriage of justice to allow this "settlement" to stand and therefore I request that the Court vacate it and permit a new trial.

(Id, ¶¶17 & 21).

### G. The Motion to Vacate the Coerced Settlement

78. The court granted a hearing on the Defendants' motion to set aside the purported settlement but did not address at that hearing whether Mr. Hecksteden has been

15

coerced into entering the agreement. The court did not address the issue of whether the threat to refer Mr. Hecksteden in the context of a civil case was appropriate. Instead, the court indicated that it would hold factual hearings on whether Mr. Hecksteden could prove that he did not do what the Plaintiff's counsel had charged.

79. The court explained its reason for ultimately denying the request as follows:

> The court informed them, however, that the certification already submitted by their tax accountant was not sufficient to support an allegation that their decision would have been any different had they been able to contact him. In other words, in order for a contact with their tax accountant to have made any difference, the tax accountant would have to certify that any expenses that had been reimbursed by the employer and deducted as expenses for the "side company" were discounted off of the "side company" tax return in a subsequent IRS audit, because they had been listed erroneously. Were that to have been the case, defendants would not have committed tax fraud because reimbursed expenses would not, in the end, have been deducted knowingly.

(Cerra Cert., Ex. "F", p. 3).

80. In the court's opinion, it was not material that the Defendants had been audited on the tax returns in question, and that the Internal Revenue Service had demanded that the Defendants capitulate to a substantial reduction in all expenses claimed. (Certification of Stephen Martino, CPA in Support of Motion to Vacate Settlement, ¶11) (Cerra Cert. Ex. "D", p. 27a).

81. Thus, the post-trial hearing devolved into an audit-like proceeding by which the court sought to determine to what extent the Hecksteden's tax returns were accurate. The court determined that evidence of whether Mr. Hecksteden had been coerced, or entered the agreement under duress, was not germane. It completely

16

dismissed the testimony of William Hecksteden and Deborah Hecksteden on the issue of their duress, and focused improperly on the issue of whether the threatened charge was true:

> The day for the plenary hearing arrived. Mrs. Hecksteden testified. Mr. Hecksteden testified. None of the information that had been requested was the subject of testimony, despite the fact that the tax accountant was sitting in the courtroom. Accordingly, the court asked counsel when they were going to provide the relevant information. We recessed to chambers and again had a discussion as to the necessity of showing that there was something that the accountant knew that Mr. Hecksteden did not know when he entered into the settlement.

(Cerra Cert., Ex. "F", p. 4).

                                              Respectfully submitted,

                                              FORMAN HOLT & ELIADES LLC
                                              Attorneys for Plaintiffs/Debtors
                                              William and Deborah Hecksteden

                                              By: /s/_____
                                                    Joseph M. Cerra

Dated: January 30, 2006

M:\PET\HECKSTEDEN\PLEADINGS\ADVERSARY\Rule56.1.DOC